*648 OPINION OF THE COURT
Edward H. Lehner, J.
Petitioners bring this CPLR article 78 proceeding seeking a declaration that the March 9, 2006 determination by respondent New York City Campaign Finance Board, assessing penalties against them, was arbitrary and capricious. The determination assessed penalties of $61,750, jointly and severally, against petitioners for alleged violations of the New York City Campaign Finance Act (Administrative Code of City of NY § 3-701 et seq.). The penalties were purportedly assessed pursuant to Administrative Code § 3-711. The Board’s verified answer includes a counterclaim for an order directing petitioners to pay the penalty assessed in the determination. Petitioners contend that the counterclaim is untimely.
Petitioner Pedro Espada, Jr. was a candidate for the position of Bronx Borough President in the 2001 Democratic Party primary, and he participated in the voluntary public matching funds program established by the Act. Petitioner Espada 2001 (Committee) is a political committee designated by Espada, pursuant to the Act, as the principal committee for the 2001 Borough President election. Petitioner Kenneth Brennan is the treasurer of the Committee.
Petitioners initially assert that respondent’s counterclaim is untimely in that CPLR 214 (2) requires that “an action to recover upon a . . . penalty . . . created or imposed by statute” be commenced within three years of the accrual of the claim. However, the Act sets forth no limitation as to when the Board must render a determination, and here there was no penalty upon which it could have sued until it rendered its determination in March 2006. There is no dispute that petitioners timely commenced this proceeding, and that the Board interposed its counterclaim well within three years after the assessment became final, which is when the claim accrued. (See, State of New York v Hollander, 245 AD2d 625 [3d Dept 1997]; State of New York v Uzzillia, 156 AD2d 261 [1st Dept 1989].)
The covering letter dated March 27, 2006 accompanying the determination states that the “Board may . . . initiate a civil action to compel payment against the committee, the candidate, and the treasurer who are jointly and severally liable pursuant to law.” However, as applicable to the 2001 election, Administrative Code § 3-711 (1) provided that the treasurer of a principal committee may be subject to a civil penalty only if he or she has committed a violation of a provision of the Act or of a Board rule. Said subsection provided as follows:
*649 “Any participating candidate whose principal committee fails to file in a timely manner a statement or record required to be filed by this chapter or the rules of the board in implementation thereof or who violates any other provision of this chapter or rule promulgated thereunder, and any principal committee treasurer or any other agent of a participating candidate who commits such a violation or infraction, shall be subject to a civil penalty in an amount not in excess of ten thousand dollars.”
The determination nowhere states that Brennan has personally violated any provision of the Act, or any Board rule. Indeed, in paragraph 58 of its answer, the Board candidly acknowledges that its audit process “does not determine whether candidates or treasurers personally commit violations.” To be sure, Brennan, as well as Espada, signed the required certification form (see Administrative Code § 3-703 [1] [c]), which provided that “I further understand that I may be jointly and severally liable for the repayment of public funds and/or civil penalties pursuant to Sections 3-710 and 3-711 of the Act.” However, this language cannot be read as an agreement to be liable, other than as provided for by the cited sections of the Administrative Code. By its own terms, the certificate does not expand the reach of the Administrative Code. (See, Matter of Mossa v New York City Campaign Fin. Bd., NYLJ, Apr. 28, 2006, at 18, col 1 [Sup Ct, NY County]; New York City Campaign Fin. Bd. v Jennings, Sup Ct, NY County, 2005, Edmead, J., Index No. 402998/03.)
It may well be that determining that particular individuals have committed violations (or violations or infractions, as Administrative Code § 3-711 now provides) is beyond the Board’s current capacity, or that making such determinations would be at odds with the Board’s conception of its role. In either case, the Board’s argument, that the Act will be gutted if individuals cannot be penalized without a finding that they have performed an act that subjects them to a penalty by the terms of Administrative Code § 3-711, is one that would be better addressed to the city council. (See, New York City Campaign Fin. Bd. v Ortiz, 38 AD3d 75 [1st Dept 2006].) In sum, insofar as the determination purported to assess penalties against Brennan pursuant to Administrative Code § 3-711, it is contrary to law, and thus is annulled. (CPLR 7803 [3].)
The determination also does not find that Espada personally violated the Act or any Board rule. However, as applicable to *650 the 2001 election, Administrative Code § 3-711. provided that a participating candidate is subject to a civil penalty, not only if he or she has committed a violation, but also if his or her principal committee fails to timely file a “statement or record” required to be filed by either the Act or the Board’s rules. With respect to some of the violations for which the Board assessed penalties, the determination asserts that the Committee failed to report various loans and in-kind contributions that it was required to report, and that it filed certain fraudulent contributions, to wit, contributions allegedly received from employees of Soundview Healthcare Network, a not-for-profit entity controlled by Espada, which contributions were reimbursed to the employees by Soundview. The reason that these filings were asserted to be fraudulent is that the Committee sought four-to-one matching public funds on the basis of the purported contributions. It is self-evident that if a candidate can be penalized for a failure by his or her principal committee to file a required record, then all the more can such a candidate be penalized for the filing of a false record. Accordingly, pursuant to Administrative Code § 3-711, Espada, as well as the Committee, may be subject to a penalty for the violations that pertain to issues of reporting.
Petitioners raise three procedural grounds for annulling the determination as a whole. They first contend that the Board abused its discretion when it refused to postpone the March 9, 2006 hearing, at which it adopted the determination, until after the conclusion of an apparently then-ongoing criminal investigation indirectly referenced by the Board. The Board had cooperated with the State Attorney General in a criminal investigation of several matters pertaining to Soundview. As a result of that investigation, four senior managers and two other employees of Soundview were indicted and pleaded guilty to charges stemming from Soundview’s use, for the benefit of Espada’s campaign, of governmental funds that it had obtained for its WIC and HIV programs.
In August 2003, and again in January 2006, the Board’s records officer denied petitioners access to certain documents responsive to Freedom of Information Law requests that they had made. In part, the records officer based such denial on Public Officers Law § 87 (2) (e) (i), which provides that documents that “are compiled for law enforcement purposes and which, if disclosed, would: . . . interfere with law enforcement investigations or judicial proceedings,” may be withheld from disclosure. *651 Inasmuch as the last four of the Soundview employees to be convicted were sentenced in August 2005, both Espada and Brennan could reasonably have concluded from the Board’s January 6, 2006 letter that they were then targets of a still-ongoing criminal investigation. By letter dated February 17, 2006, petitioners’ counsel requested that the previously-imposed February 17, 2006 deadline for the submission of documents, and the administrative hearing scheduled for March 9, 2006, be adjourned until after the conclusion of any criminal investigation of petitioners in which the Board was cooperating. Counsel argued that petitioners should not be placed in the position of having to choose between refusing to testify in the administrative proceeding, or risk having any such testimony used against them in a criminal proceeding. The Board denied that request, apparently on the ground that the matter had already been adjourned three times “to accommodate the scheduling needs of the Espada campaign and the Board.” (Board letter dated Feb. 24, 2006.)
An examination of the voluminous papers shows that the delays in the processing of the administrative proceeding can be attributed to both parties. Here, no criminal charges were even asserted against Espada, who contends both that the Board did not act timely in rendering its determination and that it acted improperly in not delaying the proceeding until a final decision was made by prosecutors as to whether to institute criminal charges against him.
Regarding fears of self-incrimination, it has been held that: a “criminal defendant has no right to stay a disciplinary proceeding pending the outcome of a related criminal trial” (Matter of Watson v City of Jamestown, 27 AD3d 1183, 1184 [4th Dept 2006]); it is not improper “to conduct the administrative proceeding during the pendency of criminal charges” (Matter of Gross v De Buono, 223 AD2d 789, 791 [3d Dept 1996]); “invoking the privilege against self-incrimination is generally an insufficient basis for precluding discovery in a civil matter” (Access Capital v DeCicco, 302 AD2d 48, 52 [1st Dept 2002]); and “the privilege against self-incrimination may not be asserted or claimed in advance of questions actually propounded” (Matter of Figueroa v Figueroa, 160 AD2d 390, 391 [1st Dept 1990]). Thus, the Board did not act improperly in denying petitioners the requested indefinite adjournment of the administrative proceeding.
Petitioners further argue that the Board impermissibly broadened the scope of its investigation inasmuch as the final *652 audit report dated March 22, 2006 took issue with the “Campaign,” which was defined to mean the three petitioners collectively, whereas the June 9, 2003 draft audit took issue solely with the Committee. This argument fails because, while the determination referenced certain findings in an earlier draft audit, on October 20, 2005 the Board sent a notice of alleged violations, proposed penalties, and opportunity to respond (October 20 notice), addressed to all three petitioners and stating that, at a December 13, 2005 meeting, the Board would consider alleged violations of the Act “by the candidate, the treasurer, and the Committee named above, and proposed penalties against the candidate, the treasurer, and the Committee named above (collectively, the ‘Campaign’)” pursuant to section 3-711. Thus, Espada was on notice that the Board was considering assessing penalties against him personally, as well as against the Committee.
Finally, petitioners argue that the Board failed to specify its charges in sufficient detail to allow them to adequately address same. Petitioners responded to the October 20 notice in a letter dated December 2, 2005, in the course of which they claimed in a general way that the Board had failed to give them sufficient details concerning the transactions on the basis of which the Board was proposing to penalize them. However, petitioners had notice of the transactions that were at issue, not only from the October 20 notice, but also from the earlier draft audit to which they had responded. Many of petitioners’ current arguments are that the Board did not cite the rule or provision of the Act on the basis of which it proposed to assess penalties. Those arguments are unpersuasive. Candidates and their agents who choose to participate in the matching funds program will be deemed to be cognizant of the statutory and regulatory provisions that govern the administration of that program.
The Board, in turn, raises the procedural argument that almost all of petitioners’ arguments are barred because they failed to raise them in the proceedings before the Board. That argument is largely based upon the Board’s contention that arguments raised by petitioners in the audit phase of the Board’s proceedings should not be considered to have been raised in the penalty phase of the proceedings. Here, inasmuch as the penalty proceeding was based on information that the Board developed in the audit proceeding, it would be fundamentally unfair to bar petitioners from addressing matters that they raised in that proceeding. Accordingly, the court now turns to petitioners’ substantive objections to the violations charged.
*653 Violation 1 assessed a $2,500 penalty for accepting and failing to report an in-kind contribution from the Bronx New York Tribune, Inc., a publication owned by Espada and which reported on his campaign. Administrative Code § 3-703 (1) (f) then provided that a candidate must “not accept and his or her principal committee and any other political committee authorized by such candidate must not accept, either directly or by transfer, any contribution or contributions from any . . . corporation . . . which in the aggregate ... for borough president, shall exceed” $3,500. Petitioners responded to the questions that the Board raised about this issue in the draft audit by agreeing to adopt the publication costs of the newspaper as an expenditure of the Committee, but they claimed that the original records pertaining to those costs had been subpoenaed in the criminal investigation and that they had no copies. Plainly, petitioners were on notice that the publication costs were an issue for the Board, and they could have copied the subpoenaed records in order to provide disclosure to the Board. Their failure to have done so cannot be laid at the Board’s feet. Accordingly, both Espada and the Committee are liable for this penalty.
Violation 2 assessed a $10,000 penalty for accepting, and failing to report, a corporate in-kind contribution from Soundview. It is undisputed that Soundview provided goods and services for Espada’s campaign. Petitioners argue, however, that there is no evidence that those goods and services constituted a contribution within the meaning of Administrative Code § 3-702 (8). That section defines “contribution” to exclude the giving of anything of value, when “the candidate or his or her agents or political committees . . . did not authorize, request, suggest, foster or cooperate in any such activity.” Esther Hill, who was the campaign manager of Espada’s campaign and a Soundview manager, pleaded guilty to having, among other things, “fraudulently obtained . . . money intended for the WIC and HIV programs . . . and [having] applied said funds to pay for costs incurred in advancing the [Espada campaign],” and to having “repeatedly ordered and caused WIC workers to do non-WIC partisan political campaign work during WIC work hours.” Accordingly, at the very least, the Committee cooperated in accepting the goods and services donated by Soundview. Moreover, inasmuch as Espada is the chief executive officer and president of Soundview, it would not have been arbitrary for the Board to have presumed that he had cooperated in such acceptance. Accordingly, the Committee may be penalized for having accepted the contributions from Soundview.
*654 Administrative Code § 3-703 (6) required every principal committee to “report, to the best of the candidate’s, treasurer’s and authorized committees’ knowledge, to the campaign finance board every contribution . . . received by the candidate, such principal committee and any other authorized committee of such candidate.” Inasmuch as it is undisputed that the in-kind Soundview contributions were not reported to the Board, both the Committee and Espada may be penalized for such failure to report.
Violation 3 assessed a $10,000 penalty “for accepting from the candidate more than $203,518 in excess of the contribution limit,” including loans from Espada and goods and services from entities, including Soundview, that the Board deemed a single source with the candidate. Petitioners argue that this charge is invalid because Administrative Code § 3-702 (8) (c) exempts payments made by the candidate from the definition of contribution. The definition of “contribution” in that section pertains to eligibility for matching funds. Independently of that definition, Administrative Code § 3-703 (1) (h) then limited the expenditures that a candidate who participates in the matching funds program can make to “contribution[s] to his or her principal committee in an amount that does not exceed three times the maximum contribution amount applicable pursuant to paragraph (f) of this subdivision,” which was $3,500. Consequently, petitioners’ statutory argument fails and the Committee, but not Espada, is liable for this violation for “accepting” the excess contribution.
Violation 4 pertains to the filing of the purported contributions of money by Soundview employees, which are discussed above, and violation 5 pertains to the subsequent filing of affidavits, many of them notarized by Ms. Hill, purporting to validate those contributions. The Board assessed a $10,000 penalty for each of these violations. Petitioners argue that they cannot be held responsible for the actions of Soundview personnel. However, as noted above, Espada is the founder and chief executive of Soundview, and Ms. Hill was both Espada’s campaign manager and a manager of Soundview. In these circumstances, it was not arbitrary for the Board to ascribe, at least to the Committee, a knowledge that the purported contributions from Soundview employees were sham, and that the affidavits which purported to validate those contributions were false, and thus the penalties were validly imposed against both Espada and the Committee.
*655 Violation 6 assessed a $2,500 penalty for listing a $230,000 outstanding liability to Community Leadership Network, a political organization founded by Espada, as a campaign expense. That amount was subsequently reduced to $75,881, without explanation. While petitioners state that “[t]he Committee committed to pay Community Leadership Network for election day workers” (petitioners’ mem of law at 20), they do not assert that any payments were actually made. Both Espada and the Committee are liable for this violation.
Violation 7 assessed a $1,000 penalty for submitting four money orders, all of which bore suspect signatures. Petitioners withdrew those money orders as a claim for matching funds on September 8, 2003 in response to the Board’s draft audit, and they do not now contend that the signatures on them were valid. Both the Committee and Espada are liable for this violation.
Violation 8 assessed a $2,500 penalty for failure to provide copies of all cancelled checks representing loans from Espada, as called for by the Board’s draft audit. Petitioners’ contention that the only checks that the Board’s rules require a candidate to keep are “all returned and cancelled disbursement checks” (52 RCNY 4-01 [f] [2]) is incorrect. 52 RCNY 4-01 (b) (2) requires participants to “maintain a photocopy of each check . . . representing a contribution.” A loan, however, is a “contribution,” within the meaning of Administrative Code § 3-702 (8), only if it has not been repaid by the date of the election for which the participant was campaigning. The determination does not state that the loans upon which this violation is based were not repaid prior to the primary election in which Espada was a candidate. With respect to loans, the rules require unspecified “written documentation” of each loan received, and either repaid or forgiven. (52 RCNY 4-01 [g].) Adopting the Board’s argument that participants are required to provide such documentation as the Board may request (see 52 RCNY 3-02 [f| [7]), whether or not they have had any prior notice alerting them to the need to maintain the records needed to satisfy such a request, would amount to a denial of the participants’ right to due process of law. Accordingly, neither the Committee, nor Espada, may be penalized under violation 8.
Petitioners do not challenge violations 9 and 10 which, together, imposed a $2,500 penalty for failing to report certain contributions.
Violations 11 through 16 set forth a total of $8,100 in penalties for accepting and failing to report six in-kind contributions, *656 each of which, alone or together with a monetary contribution, exceeded the permissible maximum for contributions. Each of these alleged in-kind contributions was in the form of services provided to Espada’s campaign by a vendor. Those vendors were not paid, in all likelihood because the Committee operated the campaign on the assumption, later proven false, that it would receive public matching funds. 52 RCNY 1-04 (g) (5) provided that “[a] debt owed by a participant which is forgiven or settled for less than the amount owed is a contribution, unless the debt was forgiven or settled by a creditor who has treated the outstanding debt in a commercially reasonable manner.” The Board argues that petitioners have failed to present any evidence that any of the vendors made a commercially reasonable attempt to collect the monies that they were owed. It is one thing to require participants in the matching funds program to maintain and provide certain records. It is quite another thing to place on them the burden of proving that vendors have acted in a commercially reasonable manner. The determination asserts neither that any of the debts arose from other than an arm’s-length transaction, nor that there was a commercially reasonable manner in which any of the six creditors could have recovered the amounts due to them. While in some circumstances a failure to act in an attempt to collect a debt constitutes forgiveness of the debt, in other circumstances such a failure is no more than the commercially reasonable response to the situation of the debtor. This court will not speculate on whether, for example, it would have been commercially reasonable for any of the vendors to incur even minor expenses, let alone attorney’s fees, in an attempt to recover the sums that they were owed.
Petitioners do not challenge violation 17 which imposed a $500 penalty for failure to report a bank account. Both the Committee and Espada are liable for this violation.
Violations 18 through 20 all pertain to petitioners’ failure to provide certain financial documents of Espada 2000, Espada’s principal committee when he ran for the State Senate. Pursuant to 52 RCNY 3-02 (f) (5), as applicable to the 2001 election, candidates were required to comply with Board requests for “financial records” of “[plolitical committees authorized by a participant that are not involved in the election in which the candidate is currently a participant.” Violation 18 assessed a $500 penalty for failure to provide certain bank statements of Espada 2000; violation 19 assessed a $250 penalty for failing to *657 provide deposit slips; and violation 20 assessed a $500 penalty for failure to provide corporate resolutions and bank records indicating the tax identification numbers and authorized signatories for the Espada 2000 account. However, the Board does not dispute petitioners’ assertions that no statute or rule requires political committees to keep copies of deposit slips or of corporate resolutions, and that petitioners informed the Board of the identity of authorized signatories for the Espada 2000 account. Accordingly, while the Committee and Espada are liable for violation 18, neither is liable for either violation 19 or 20.
Violation 21 assessed a $1,000 penalty for expenditures by the Committee that violated a prohibition of most campaign spending in the period between the originally scheduled primary election date of September 11, 2001, and the rescheduled date of September 25, 2001. The Board instituted the prohibition in a statement by its chairman on September 13, 2001, published in the Board’s Advisory Opinion 2001-12 (Sept. 20, 2001) (Op 2001-12). Petitioners do not contend that they lacked timely notice of the prohibition, but they argue that they were not bound by it, and that Administrative Code § 3-711 does not provide for the imposition of a civil penalty for the violation of an advisory opinion.
New York City Charter § 1052 (a) (7) and Administrative Code § 3-708 (7) authorize the Board to issue advisory opinions, whether on request or on its own initiative. While advisory opinions, generally, do not have the force of rules, Op 2001-12, which was adopted in light of the emergency rescheduling of the primary election and which could not timely have been adopted as a formal rule, was intended to have binding effect on all of the candidates in that election, and to prevent any of them from gaining an advantage as a result of the September 11 attacks. Given those circumstances, and given petitioners’ tacit acknowledgment that they knew that the Board had issued Op 2001-12, this court concludes that Op 2001-12 could be enforced as a rule against petitioners, and that a violation of that opinion subjects the Committee, but not Espada, to a penalty.
The Board generally requires principal committees to submit letters from their vendors stating that they did not use subcontractors in connection with providing goods or services to the committee. Violation 22 assessed a $200 penalty for the Committee’s failure to provide such letters from five of its vendors. Petitioners contend that they wrote to each of those vendors to request the required letters, and that doing so satis *658 fled the “best efforts” standard of former 52 RCNY 4-02 (a). That rule required candidates to use their best efforts “to obtain, maintain, and, if requested, submit to the Board the required information,” and it provided that with regard to certain records, not including those at issue in this violation, “the participant will not be considered to have exercised best efforts unless he or she has made at least one written effort per transaction to obtain a duplicate copy of the documentation.” It was not arbitrary for the Board to determine that writing one letter to each of the five vendors, without even a follow-up telephone call, did not constitute best efforts, within the meaning of section 4-02. Therefore, both the Committee and Espada are liable for this violation.
In summary, it is hereby ordered and adjudged that the petition is granted to the extent that the March 9, 2006 determination of the New York City Campaign Finance Board is annulled as to petitioner Kenneth Brennan; and it is further ordered and adjudged that said determination is annulled to the extent that it assessed penalties against petitioner Pedro Espada, Jr. for violations 3, 8, 11 through 16, and 19 through 21, and to the extent that it assessed penalties against Espada 2001 for violations 8, 11 through 16, 19, and 20, and it is therefore adjudged that respondent’s counterclaim is granted to the extent that Pedro Espada, Jr. and Espada 2001 are jointly and severally liable for civil penalties to respondent New York City Campaign Finance Board in the amounts of: $2,500 for violation 1; $10,000 for violation 2; $10,000 for violation 4; $10,000 for violation 5; $2,500 for violation 6; $1,000 for violation 7; $2,500 for violations 9 and 10; $500 for violation 17; $500 for violation 18; and $200 for violation 22, for a total of $39,700, and respondent is accordingly granted judgment against Pedro Espada, Jr. and Espada 2001 jointly and severally, for $39,700; and that, in addition, Espada 2001 is liable for civil penalties in the amount of $10,000 for violation 3, and $1,000 for violation 21, for a total of $11,000, and that respondent is accordingly granted an additional judgment against Espada 2001 for said $11,000; and respondent may have execution therefor.